UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Sisavang Danouvong, Administratrix of the Estate of Sang Danouvong,<br>        *Plaintiff*,<br><br>        *v.*<br><br>Life Insurance Company of North America,<br>        *Defendant.* | Civil No. 3:08cv667 (JBA)<br><br><br><br>September 30, 2009 |

RULING ON CROSS-MOTIONS FOR JUDGMENT ON
THE ADMINISTRATIVE RECORD [Doc. ## 18, 27]

Plaintiff Sisavang Danouvong, the daughter of decedent Sang Danouvong and administratrix of his estate, brings suit against Defendant Life Insurance Company of North America ("LINA") challenging LINA's denial of a claim for benefits under a Group Accident Policy (the "Policy"). The insurance plan, provided through the decedent's former employer, is governed by the Employee Retirement Income Security Act of 1974 (ERISA), as amended, 29 U.S.C. §§ 1001 *et seq.* The parties have cross-filed for "judgment on the administrative record." For the reasons stated below, Defendant's motion will be denied and Plaintiff's motion will be granted in part to order remand with instructions but not to award benefits due under the policy or attorney's fees or costs.

I.      Background

The Administrative Record,[1] which the parties have agreed provides the basis for the Court's decision, reveals the following.

A.      Collision Leading to Decedent's Death

Early in the morning on Saturday, August 19, 2006, construction work was ongoing in the left lane on the westbound side of Boston Avenue at North Hallett Street in Bridgeport, various construction zone warnings—including at least seven signs set up over the course of approximately one mile and at least a quarter-mile of reflective cones directing westbound traffic into the right lane—had been set up on Boston Avenue east of the construction site, and a dump truck was facing east in the left lane with its headlights and flashing lights activated.  (LINA 319, 364, 366, 391, 406–07, 417–19.)  At approximately 1:20 a.m., Mr. Danouvong, driving west on Boston Avenue in a Dodge Caravan "at a high rate of speed," entered the left lane and, without taking any "avoidance maneuver[s]," collided "head on" with the dump truck.  (*Id.*; see also Pl.'s Mem. Supp. J. at 2–3.) Emergency response and medical personnel responded to the scene and brought Mr. Danouvong to Bridgeport Hospital, but shortly after reaching the hospital Mr. Danouvong died from the "multiple blunt force traumatic injuries" he suffered during the collision.  (*Id.* at 319, 391, 417–19.)  At the time of his death, the decedent had cirrhosis of the liver, was

---

[1] The record, filed manually as Exhibit A to Defendant's Memorandum in Support [Doc. # 18-2], is Bates-stamped with the precursor "LINA" and will be cited hereafter as "LINA ---".

experiencing "acute ethanol intoxication," and had a Blood Alcohol Content ("BAC") of between 0.26 and 0.27 percent.  (*Id.* at 383–84, 419.)

At oral argument Plaintiff conceded that the collision would not have occurred had the decedent not been drunk and agreed that it was impossible to determine the decedent's subjective mindset prior to the collision.[2]

B.     Insurance Policy

LINA underwrote the Policy under which the decedent was insured.  (*See* LINA 001–036.)  This Policy provided a benefit of "100% of the Principal Sum"—calculated by reference to the insured's annual compensation—for any "Loss of Life" determined to be a "Covered Loss."  (LINA 006, 008.)  A "Covered Loss" is defined by the Policy to be

[a] loss that is all of the following:
1.   the result, directly and independently of all other causes, of a Covered Accident;
2.   one of the Covered Losses specified in the *Schedule of Covered Losses*;
3.   suffered by the Covered Person within the applicable time period specified in the *Schedule of Benefits*.

(LINA 012.)  The parties agree that Mr. Danouvong's death qualifies under the second and third portions of the Policy's definition of a "Covered Loss," but dispute whether his death

---

[2] At oral argument Plaintiff's counsel stated that "[Mr. Danouvong's] intoxication absolutely caused his death.  That's conceded.  I mean, the fact that he was drinking and driving caused his death in this particular case."  He agreed that "we don't know whether he passed out, we don't know whether he intentionally drove at the construction equipment, we don't know whether his perceptions . . . were somehow distorted and he didn't know what he was doing.  We don't know anything."  (Oral Arg. Tr. at 27, 45.)

is "the result, directly and independently of all other causes, of a Covered Accident."  The

Policy defines a "Covered Accident" to be

> A sudden, unforeseeable, external event that results, directly and
> independently of all other causes, in a Covered Injury or Covered Loss and
> meets all of the following conditions:
>
> 1.  occurs while the Covered Person is insured under this Policy;
> 2.  is not contributed to by disease, Sickness, mental or bodily infirmity;
> 3.  is not otherwise excluded under the terms of this Policy.

(*Id.*)  While some of the terms in the definition of "Covered Accident" are further defined

in the Policy, the Policy does not define "unforeseeable," which is the term critical here.

> C.     Benefits Claim and Denial

Mr. Danouvong designated three of his children, including Plaintiff, as his

beneficiaries.  (LINA 296.)   On August 25, 2006, Mr. Danouvong's former employer

submitted a claim for benefits in the amount of $119,000 on behalf of one of Mr.

Danouvong's beneficiaries.  (*See* LINA 287–315.)  On May 1, 2007, LINA denied this claim

for benefits in a letter that listed and summarized the "[e]vidence [e]valuated"—which

included the "[p]olice [c]rash [r]eport"—and stated:

> We have confirmed that Mr. Danouvong's blood alcohol level was .26%. This
> data shows that his blood alcohol level was over three times the DUI limit for
> the state of Connecticut which is .08%.  We have determined that the crash
> does not meet the definition of Covered Accident.
>
> As stated above, a Covered Accident must be an unforeseen event.  The
> hazards of driving while intoxicated are widely known and publicized.  It is
> also well-known in the general public that driving while intoxicated could
> result in bodily harm or death.

(LINA 201–04.)  The letter also suggested that in the alternative, Mr. Danouvong's death fell

within an exclusion for "intentionally self-inflicted [i]njur[ies]."  (*Id.*)

On October 30, 2007, having been appointed the administratrix of Mr. Danouvong's estate and having obtained counsel, Plaintiff sought reconsideration of the May 1st denial, arguing both that Mr. Danouvong's death was not an intentionally self-inflicted injury and also that while the Policy does not define the term "unforeseeable," under a dictionary definition of "foreseeable" Mr. Danouvong's death was "unforeseeable" because "it cannot reasonably be asserted that death as a result of driving while intoxicated is 'certain' or 'unavoidable.'" (LINA 193–94 (quoting "Webster's").)  Two months later, on December 27, 2007, then-counsel for Plaintiff submitted Mr. Danouvong's medical records and "supplement[ed]" the October 30th letter in order to reference a District of Connecticut case that had ruled a decedent–insured's drunk driving death to be accidental, *see Glynn v. Banker's Life & Cas. Co.*, 432 F. Supp. 2d 272 (D. Conn. 2005), and to invoke the principle that courts in the Second Circuit "construe[] ambiguities in Plan language against the drafter."  (LINA 050–52; *id.* at 053–186 (cases and medical records submitted).)

LINA construed the October 30th and December 27th letters as appeals from the May 1st denial of benefits, and denied the appeal on February 11, 2008.  In the denial-of-appeal letter, LINA stated that it reviewed, *inter alia*, the Police Accident Report, the Autopsy and Toxicology Report from the Office of the Chief Medical Examiner, the October 30th and December 27th letters, and the supplemented medical records of Mr. Danouvong. (LINA 043–47.)  Like the May 1st letter, the February 11th letter summarized the evidence, including the medical records' documentation of "a history of alcohol abuse by Mr. Danouvong," and concluded that Mr. Danouvong's apparent alcoholism rendered his death within the exclusion for deaths caused by sickness or disease.  (LINA 045.)  The letter also noted that "[o]n May 1, 2007, this claim was denied based upon the fact that Mr.

Danouvong's motor vehicle crash was the result of his intoxication. Based upon this fact, Mr. Danouvong's death was foreseeable in nature, and thus not the result of an accident as required by the [P]olicy." (*Id.*) It then addressed Plaintiff's arguments on appeal. It rejected application of the *contra proferentem* doctrine in light of the Policy's grant of discretion to the Plan Administrator as well as Plaintiff's argument that deaths from drunk-driving-related vehicle collisions are not *per se* foreseeable:

> The dangers of drinking and driving are well known and widely publicized. In addition, driving under the influence of alcohol constitutes criminal conduct in all 50 states, including the State of Connecticut. All licensed motorists are aware that such conduct violates the law and is subject to criminal punishment. The Legislature of the State of Connecticut, in criminalizing Driving under the Influence, has declared such conduct to represent a recognized and unacceptable danger to the motoring public and to the citizens of Connecticut. The insured, as a licensed driver in the State of Connecticut, is charged with this knowledge.
>
> In addition, administratively, a DUI conviction for a BAC level above .16% carries an enhanced DMV administrative license suspension. . . . This enhanced penalty is a further reflection of the State of Connecticut's disapproval for conduct involving vehicular operation with dangerously high BAC levels. Thus, loss which is resultant of impaired vehicle operation, as is the case in Mr. Danouvong's motor vehicle crash based upon the opinions of the Bridgeport Police Department and the Medical Examiners Office, does not meet the required definition of Covered Accident in the [P]olicy. As such, no benefits are payable under [the] [P]olicy.
>
> . . . We trust your review of the federal common law of ERISA will reveal that DUI related deaths in the [Accidental Death and Dismemberment] context have been routinely determined by the federal appellate courts addressing the issue to be "non-accidental" in nature.
>
> With regard to your assertions surrounding the term "unforeseeable" as referenced in the [P]olicy, LINA construes the term "unforeseeable" to be that which a reasonable person could reasonably foresee under the same or similar circumstances. LINA construes the term "foresee:" [*sic*] in its

6

"ordinary and popular sense", as required under ERISA, to mean "to see beforehand", "anticipate". [*sic*].

(LINA 046.)

Plaintiff filed suit two months later, on April 8, 2008, seeking "the [P]olicy limits plus reasonable costs and fees associated with this action and the underlying appeal pursuant to 29 U.S.C. [§] 1132 *et seq.*"  (Compl., Ex. to Not. Removal [Doc. # 1] at ¶ 11.)

II.     Standards

The Federal Rules of Civil Procedure do not address motions for judgment on the administrative record.  The Second Circuit has, however, "treat[ed] [a] motion[] for 'judgment on the administrative record' as [a] motion[] for summary judgment under Rule 56," *Flanagan v. First Unum Life Ins.*, 170 F. App'x 182, 184 (2d. Cir. 2006) (citing *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003)), at least where, as here, the Court has not previously ruled on a party's summary-judgment motion, *cf. Muller*, 341 F.3d at 124. Under the familiar summary-judgment standard, judgment is appropriate where the record after discovery "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The parties agree that this Court should apply an arbitrary and capricious standard to its review of the Plan Administrator's denial.[3]  Under this "narrow" standard of review,

---

[3] (*See* Pl.'s Mem. Supp. J. [Doc. # 27-2] at 5; Def.'s Mem. Supp. J. [Doc. # 18-2] at 8.) Because the Policy expressly grants discretion to the Plan Administrator "to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact" (LINA 020), arbitrary-and-capricious review is appropriate.  *See Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2348 (2008) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 115 (1989)). The parties' agreement is consistent with the Supreme Court's decision in *Glenn* because "[f]ollowing *Glenn*, a plan under which an administrator both evaluates and pays benefits claims creates the kind of

the Court "may overturn an administrator's decision to deny ERISA benefits only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law," *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83–84 (2d Cir. 2009) (internal quotations omitted), but, "[n]evertheless, 'where the administrator imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious,'" *Pepe v. Newspaper and Mail Deliveries'–Publishers' Pension Fund*, 559 F.3d 140, 147 (2d Cir. 2009) (quoting *McCauley*, 551 F.3d at 133). Even where review is deferential, "rules of contract law [apply] to ERISA plans," *Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 81 (2d Cir. 2009) (citation omitted), and "[t]he law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous" or meaningless, *United Illuminating Co. v. Wisvest–Connecticut, LLC*, 259 Conn. 665, 674 (2002). In addition, an ERISA policy must be interpreted "'in an ordinary and popular sense as would a person of average intelligence and experience.'" *Pepe*, 559 F.3d at 147 (quoting *Critchlow v. First Unum Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004)).

"In reviewing the administrator's decision deferentially, a district court must consider 'whether the decision was based on a consideration of the relevant factors.'" *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (quoting *Jordan v. Retirement*

---

conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make *de novo* review appropriate," *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008); *see also Glenn*, 128 S. Ct. at 2350 (no "change in the *standard* of review, say, from deferential to *de novo*," is implicated by a conflict of interest), and Plaintiff concedes that apart from the fact that Defendant both evaluates claims and pays benefits, "there is no further evidence of the insurer's conflict in the administrative record" (Pl.'s Mem. Supp. at 5).

8

*Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995) (in turn quoting *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285 (1974))). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight," and "[t]he [plan administrator] must articulate a rational connection between the facts found and the choice made." *Bowman Transp.*, 419 U.S. at 284 n.2 & 285 (internal quotations omitted). In determining whether, in an ERISA eligibility determination, the interpretation is arbitrary and capricious, the relevant factors were considered, or substantial evidence was relied upon, the Court is limited to the reasons given "at the time of the denial." *Karanda v. Conn. Gen'l Life Ins. Co.*, 158 F. Supp. 2d 192, 198 n.4 (D. Conn. 2000) (citing *Short v. Cent. States, Se. & Sw. Areas Pension Fund*, 729 F.2d 567, 575 (8th Cir. 1984) ("A post hoc attempt to furnish a rationale for a denial of pension benefits in order to avoid reversal on appeal, and thus meaningful review, diminishes the integrity of the Fund and its administrators."), *abrogated on other grounds by Bruch*, 489 U.S. at 115).

Finally, because this deferential standard of review applies, the *contra proferentem* doctrine does not apply. *See Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 443–44 (2d Cir. 1995) ("the rule of *contra proferent*[*e*]*m* is inapplicable" where standard of review is arbitrary and capricious rather than *de novo*).

III.    Discussion

A.    LINA's Bases for Denial

LINA's arguments have shifted over time. In its May 1st denial-of-benefits letter, LINA relied on the "unforeseeable" portion of the definition of "Covered Accident," but also suggested that in the alternative, Mr. Danouvong's death fell within an exclusion for

"intentionally self-inflicted [i]njur[ies]." (LINA 201–04.) Its February 11th denial-of-appeal

letter, LINA again asserted that Mr. Danouvong's collision was not "unforeseeable," but also

asserted that Mr. Danouvong's apparent alcoholism rendered his death within the exclusion

for deaths caused by "Sickness, disease, [or] bodily or mental infirmity." (LINA 018, 046.)

In its briefing before this Court LINA argued that it had denied benefits "because a motor

vehicle crash that results from drunk driving does not qualify as an 'unforeseen event,'" and

that Plaintiff's conclusion to the contrary "was both inconsistent with the definition of

'Covered Accident' contained in the [P]olicy and the substantial body of federal common

law in similar cases." (Def.'s Mem. Supp. J. [Doc. # 18-2] at 5.) LINA abandoned reliance

on the Policy's exclusions for intentionally self-inflicted injuries as well as sickness and

disease. (Def.'s Mem. Supp. J. at 5 (listing only the not-unforeseeability of Mr. Danouvong's

collision and death as the basis for denying benefits); Def.'s Opp'n Pl.'s Mot. J. [Doc. # 23]

at 1 (same); *see also* Oral Arg. Tr. at 4–5.)

LINA also argued, however, that its "consideration of the factual circumstances

surrounding [Mr. Danouvong's] death"—as revealed by "all of the evidence contained in the

Administrative Record, including the police report, the autopsy and toxicology report, and

[Mr. Danouvong's] medical records"—supported its conclusion that Mr. Danouvong's death

was not a "Covered Accident," claiming that he "should have been aware of the heightened

risk of (i) driving while intoxicated, (ii) at a high rate of speed, (iii) through a clearly

demarcated construction zone." (*Id.* at 10–11). It also cited to a number of federal-court

decisions upholding denial of benefits where the decedent–insured died in a vehicle collision while intoxicated.[4]

By contrast, in response to the Court's question at oral argument asking Defendant's counsel whether LINA's logic in denying Plaintiff's appeal requires it to deny benefits where death in a car crash is caused by *any* risky behavior in which an insured could engage while

---

[4] Defendant cites a number of cases that have "upheld administrative determinations that deaths resulting from drunk driving were not accidental" (Def.'s Mem. Supp. J. at 13): *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1109–10 (7th Cir. 1988); *Cates v. Metro. Life Ins. Co.*, 149 F.3d 1182 (Table), 1998 WL 385897, *3, 1998 U.S. App. LEXIS 14975, *7–*8 (6th Cir. June 30, 1998); *Arnold v. Hartford Life Ins. Co.*, 542 F. Supp. 2d 471, 476–81 (W.D. Va. 2008); *Moore v. Life Ins. Co. of N. Am.*, No. 5:05cv169, 2007 WL 201068, 2007 U.S. Dist. LEXIS 4925 (N.D. W. Va. Jan. 23, 2007), *rev'd and vacated on other grounds*, 278 F. App'x 238 (4th Cir. 2008); *Sorrells v. Sun Life Assurance Co.*, 85 F. Supp. 2d 1221, 1232–36 (S.D. Ala. 2000); *Nelson v. Sun Life Assurance Co. of Canada*, 962 F. Supp. 1010 (W.D. Mich. 1997); *Schultz v. Metro. Life Ins. Co.*, 994 F. Supp. 1419, 1422 (M.D. Fla. 1997); *Miller v. Auto-Alliance Int'l, Inc.*, 953 F. Supp. 172, 176–77 (E.D. Mich. 1997); *Fowler v. Metro. Life Ins. Co.*, 938 F. Supp. 476, 480 (W.D. Tenn. 1996).

Defendant also cites a number of cases applying an arbitrary and capricious standard of review "that have applied the broader federal common law definition of 'accident' and have upheld denials of ERISA benefits in cases where the insured's death resulted from driving while intoxicated" (Def.'s Mem. Supp. J. at 14): *Stamp v. Metro. Life Ins. Co.*, 531 F.3d 84, 88–94 (1st Cir. 2008); *Lennon v. Metro. Life Ins. Co.*, 504 F.3d 617, 620–24 (6th Cir. 2007); *Eckelberry v. Reliastar Life Ins. Co.*, 469 F.3d 340, 345–48 (4th Cir. 2006); *McGillivray v. Life Ins. Co. of N. Am.*, 519 F. Supp. 2d 157, 167–69 (D. Mass. 2007); *Gilbert v. Estate of Cox*, Civ. No. 05-283-JBC, 2007 WL 2023576, *3, 2007 U.S. Dist. LEXIS 49571, *9–*10 (E.D. Ky. July 10, 2007); *Weatherall v. Reliastar Life Ins. Co.*, 398 F. Supp. 2d 918, 923–24 (W.D. Wis. 2005); *Walker v. Metro. Life Ins. Co.*, 24 F. Supp. 2d 775, 779–82 (E.D. Mich. 1997).

Finally, Defendant cites three cases upholding, under de novo review, plan administrators' denial of benefits to beneficiaries of decedents who have died in drunk driving accidents (Def.'s Mem. Supp. J. at 16): *Richardson v. Mut. of Omaha Ins. Co.*, No. 3:06cv197-H, 2007 WL 1577942, 2007 U.S. Dist. LEXIS 39704, *7–*8 (W.D. Ky. May 31, 2007); *Poeppel v. Hartford Life Ins. Co.*, 273 F. Supp. 2d 714, 720 (D.S.C. 2003), *aff'd* 87 F. App'x 885 (4th Cir. 2004); *Mullaney v. Aetna U.S. Healthcare*, 103 F. Supp. 2d 486, 494 (D.R.I. 2000).

driving—including, for example, using a cell phone[5]—he responded that "the claims administrator must examine the specific facts and circumstances in each case. We cannot say categorically or as a *per se* rule that a particular activity would not fall within the definition of 'Accident'" because determination of eligibility for benefits "does depend on the individual facts and circumstances in each case" (Oral Arg. Tr. at 7). The Court asked whether in denying coverage LINA invoked grounds other than "a categorical exclusion for driving in excess of the legal [BAC] limit," to which he responded:

> Yes. In this case, your Honor, the insurer did not apply a categorical exclusion. Rather, it evaluated all of the facts and circumstances of the decedent's death. In the denial letter it cites evidence from the toxicology report, the medical examiner's report, the police report, and it took all of those factors into consideration in concluding that the decedent's death was reasonably foreseeable. And under the abuse of discretion standard . . . all this Court need decide is whether or not that was reasonable. And in view of all of the case law upholding denials of accidental death benefits in cases of drunk driving, it was eminently reasonable for the insurer to reach that conclusion. . . . *[O]ur position is that the mere fact that [Mr. Danouvong] was driving with a blood alcohol level of .26 to .27 is sufficient in this case[.]* . . .

> [T]he insurer should take into account all of the facts and circumstances surrounding the decedent's death. The insurer did that in this case. . . . [The federal cases upholding denials of benefits to deaths caused by drunk driving] are consistent with our position in this case, which has [been] that the insurer should take into account all of the facts and circumstances[.]

(Oral Arg. Tr. at 10, 11, 21.)

---

[5] *See* Matt Richtel, *Drivers and Legislators Dismiss Cellphone Risks*, N.Y. Times, Jul. 18, 2009, at A1 ("Studies say that drivers using phones are four times as likely to cause a crash as other drivers, and the likelihood that they will crash is equal to that of someone with a .08 percent blood alcohol level, the point at which drivers are generally considered intoxicated").

B.    LINA's Application of a Categorical *Per Se* Rule

Notwithstanding LINA's equivocal assertions to this Court that it did not apply a categorical rule, both the May 1st and February 11th denial letters clearly apply such a rule. The May 1st letter contains no analysis explaining the foreseeability of the car collision, and it does not even expressly state that the car crash was foreseeable. Instead, it appears to have concluded that the crash was foreseeable from the fact that Mr. Danouvong's BAC was 0.26 percent and its *ipse dixit* pronouncements, without citation either to the record or to authority, that "[t]he hazards of driving while intoxicated are widely known and publicized" and that "[i]t is also well-known in the general public that driving while intoxicated could result in bodily harm or death." LINA's February 11th letter denying Plaintiff's appeal added an assertion regarding the Connecticut Legislature's intent in "criminalizing Driving under the Influence" and imposing "an enhanced DMV administrative license suspension," and defined "'foresee' . . . to mean 'to see beforehand', 'anticipate'." However, the February 11th letter does not provide an analysis of why or how Mr. Danouvong, in particular, should have "see[n] beforehand" or "anticipate[d]" that he would get into a fatal car collision. While the letters contain a *summary* of the facts in the record, their substance does not *rely* on any facts in the record aside from Mr. Danouvong's intoxication in concluding that his car collision—which is undisputedly alcohol-related—was not "unforeseeable." Instead, asserting that driving while intoxicated is risky, the letter presupposes that all car collisions involving excessive alcohol are foreseeable. This is a categorical rule: the logic of the denial letters, if uniformly applied, requires LINA, in all cases and without regard to the individual facts in the record, to deny benefits to any insured driver who, having consumed alcohol in excess of the legal limit, is injured or killed in a car collision.

13

C.      LINA's Failure to Consider the Relevant Facts and Circumstances

Perhaps as a result of its deployment of a categorical rule, LINA failed to consider the facts and circumstances of Mr. Danouvong's collision and death in concluding that his death was not "unforeseeable."  While an attempt to define the term *foreseeable* with specificity entails a trip through a "Serbonian Bog," *see, e.g.*, *AUSA Life Ins. Co. v. Ernst and Young*, 206 F.3d 202, 216, 217–18 (2d Cir. 2000), this difficulty reflects the fact that a determination of foreseeability must depend, at the least, on the facts and circumstances of the incident at issue, *id.* at 217 (noting that "[a] foreseeability determination in and of itself is also a question of fact for resolution by the finder of fact," and suggesting that in a bench trial, such a determination would require "a discussion of facts indicating that the district court undertook to make findings of fact specifically pertinent to the foreseeability component"). Even viewed in the light most favorable to LINA, its denial letters provide no basis on which to conclude that it considered the record as a basis for its denial in this case and that it determined, *in light of the facts and circumstances involved*, that Mr. Danouvong's car collision *and* resulting death were foreseeable beyond the fact of his serious intoxication. LINA's denial of benefits in this case is therefore arbitrary and capricious as lacking any discussion of, and not relying on, the facts and circumstances of Mr. Danouvong's collision. A "record [that] . . . shows a complete absence of *consideration* of [relevant] circumstances . . . cannot pass muster even under the deferential arbitrary and capricious standard of review." *Demirovic v. Bldg. Serv. 32 B–J Pension Fund*, 467 F.3d 208, 216 (2d Cir. 2006) (emphasis added); *see also Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1108–09 (7th Cir. 1998) (on arbitrary-and-capricious review of an ERISA eligibility determination, "the judicial focus ought to be on whether the decision of the fiduciary or trustee can be

characterized as a rational one.  The fiduciary must make[] an informed judgment and articulate[] an explanation for it that is satisfactory in light of the relevant facts, i.e., one that makes a rational connection between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached.") (internal quotations omitted).

D.      LINA's Interpretation of the term "Unforeseeable"

        ERISA requires that an insurance policy be interpreted "'in an ordinary and popular sense as would a person of average intelligence and experience.'"  *Pepe*, 559 F.3d at 147.  The over-broad categorical rule LINA applied here in construing the Policy's terms is inconsistent with any "ordinary and popular sense" of the term "foreseeable," especially in light of the fact that "[w]hat 'common knowledge' should actually tell a person driving while intoxicated is that he or she is far more likely to be arrested for driving while intoxicated than to die or be injured in an alcohol-related automobile crash, and far more likely to arrive home than to be either arrested, injured, or killed."  *West v. Aetna Life Ins. Co.*, 171 F. Supp. 2d 856, 904 (N.D. Iowa 2001); *see also Glynn*, 432 F. Supp. 2d at 281 ("The undisputed evidence on the record indicates that a male driver, 35 years or older, driving with a blood alcohol level above 0.15%, and traveling a distance of 20 miles, has a *772 in 10 million chance* of being involved in a fatal car accident," which translates into "a 99.999228% chance of survival.") (emphasis added); *Lennon v. Metro. Life Ins. Co.*, 504 F.3d 617, 629 (6th Cir. 2007) (Clay, J., dissenting) ("Statistically speaking, legally intoxicated motorists arrive safely at their destination without incident more often than not.  Of those that do not, police apprehend and arrest a great many legally intoxicated motorists.  Comparatively, the number of legally intoxicated motorists either injured or killed in crashes linked to alcohol is rather small.").

In addition, even reviewed deferentially, LINA's interpretation of the Policy's term "unforeseeable" cannot stand, for "th[e] Policy is intended to be read in its entirety," including "all the conditions, exclusions and limitations applicable to its benefits" (LINA 005), and LINA's construction of the term "unforeseeable" would "render[] . . . superfluous," *Wisvest–Connecticut, LLC*, 259 Conn. at 674, several express exclusions involving enhanced risk or danger including, for example, piloting or being a crew member on any aircraft, flying in or boarding an aircraft that is "being used for the purpose of parachuting or skydiving" or for "stunt or acrobatic flying," committing "a felony or an assault," or suffering any otherwise "Covered Accident that occurs while on active duty service in the military, naval or air force or any country or international organization" (LINA 018).   Because a person engaging in any of these activities could anticipate or see beforehand that injury or death may result from them, these exclusions would be superfluous under LINA's interpretation of "unforeseeable."   As applied in this case, LINA's determination that an event is "foreseeable" if it can be "anticipate[d]" has no metes and bounds and stretches the definition of foreseeable beyond applicable meaning.

Moreover, LINA's construction of the term "foresee" to mean "to see beforehand" or to "anticipate" would exclude from coverage any death or injury resulting from known risky activity in which a driver–insured engages, such as driving while extremely tired, using a cell phone, or being drunk, because each of these activities increases, by some anticipatable amount, the chance of a car collision.[6]   Without a limit calibrated to the purpose of the

---

[6] Indeed, under LINA's definition and usage of the term, *any* collision is "foreseeable" by any person who ever drives a car, for "sudden incapacitation is a foreseeable risk that we accept all the time in myriad contexts without demanding stringent precautions.   For example, every day millions of people drive cars without first ensuring that there is someone

Policy, which insures against accidental death and dismemberment, LINA's definition of "foresee" is an arbitrarily-imposed categorical rule underpinned by logic that would provide coverage to drivers–insureds in only a diminishingly small number of car collisions. *See Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) ("Discretion to interpret a plan, however, does not include the authority to add eligibility requirements to the plan. . . . [U]nder even the most deferential review, adding eligibility requirements to a plan is arbitrary and capricious."); *cf. Lennon*, 504 F.3d at 629–30 (Clay, J., dissenting) ("In effect, under the guise of interpretation, Defendant took it upon itself to rewrite the PAI Policy by adding terms where none previously existed.  Defendant interpreted what should be an inclusive term to exclusionary effect, excluding coverage for accidental injury following from acts which 'render[] the infliction of serious injury or death reasonably foreseeable.'  As applied to Plaintiff's claim, Defendant purports to interpret 'accidental' in this manner, but in reality add[s] a new exclusion for accidental injury sustained by legally intoxicated motorists.  This sort of post-hoc requirement falls well outside the bounds of Defendant's discretion as a plan administrator interpreting an ERISA plan, which notably 'does not include the authority to add eligibility requirements to the plan.'") (citing *Jones*, 385 F.3d at 661, 665).

Finally, LINA's reliance on the Connecticut Legislature's criminalization of driving while intoxicated conflates the magnitude of the possible harm caused by that activity with the magnitude of the risk that any harm will be caused.  *See United States v. Carroll Towing*

---

who will take the wheel if they are suddenly incapacitated." *In re City of New York*, 522 F.3d at 284, 284–88 (summarizing defendant City's arguments against liability in negligence case, agreeing that Staten Island Ferry pilot's incapacitation was foreseeable, and holding City liable because it did not take reasonable precautions in accordance with its duty of care).

*Co.*, 159 F.2d 169, 171 (2d Cir. 1947) (Hand, J.) (disaggregating "probability" and "gravity" of harm in constructing a "notion" of a person's "duty . . . to provide against resulting injuries" in tort law); *In re City of New York*, 522 F.3d 279, 284–85 (2d Cir. 2008) (summarizing and applying Hand formula); *Lennon*, 504 F.3d at 628–29 (Clay, J., dissenting) ("[K]nowledge of the risk of injury or death—both *potential* consequences of driving while intoxicated—does not equal knowledge of *probable* injury or death."). Accepting that "[t]he dangers of drinking and driving are well known and widely publicized" and "such conduct . . . represent[s] a recognized and unacceptable danger to the motoring public and to the citizens of Connecticut," as LINA asserted in denying Plaintiff's appeal, does not mean accepting that car collisions are *foreseeable* when the driver is intoxicated, a statistically unfounded position. Instead, translated into the language of tort law, that drunken driving is "a recognized and unacceptable danger" reflects the recognition that the product of the *likelihood* and *magnitude* of harm is sufficiently high to warrant penalizing those who engage in it. Therefore, LINA improperly relies on Connecticut's criminalization of drunken driving to base its conclusion that an injury or death resulting from drunken driving is not "unforeseeable."

### E.     Remand with Instructions

The Court remands with instructions because the Court rejects as arbitrary and capricious (1) LINA's interpretation of the term "unforeseeable," (2) LINA's application of a categorical *per se* rule that could, on its terms, easily be used as a *de facto* exclusion in the guise of an inclusion—and thereby impose on a claimant a burden that is rightfully the insurer's, *see Critchlow*, 378 F.3d at 256–57 ("as a matter of general insurance law, the insured has the burden of proving that a benefit is covered, while the insurer has the burden

of proving that an exclusion applies, and these principles too are applicable in ERISA cases")
(internal quotation marks omitted), especially in light of LINA's use of express exclusions
in other insurance policies for injuries and deaths of drunken-driving motorists, *see, e.g.,*
*McCrary v. Life Ins. Co. of N. Am.*, No. CV 01-360-BR, 2002 WL 31466491, *1 (D. Or. Mar.
7, 2002) ("The LINA master policy contained an exclusion for death due to driving while
intoxicated.")—and (3) LINA's failure, perhaps resulting from its deployment of the
categorical rule, to consider the facts and circumstances of Mr. Danouvong's collision and
death in making a reasoned determination about Plaintiff's entitlement to benefits.  *See
Miller*, 72 F.3d at 1071 ("[I]f upon review a district court concludes that the [plan
administrator's] decision was arbitrary and capricious, it must remand to the [plan
administrator] with instructions to consider additional evidence unless no new evidence
could produce a reasonable conclusion permitting denial of the claim or remand would
otherwise be a 'useless formality.'").

Prior to remand, however, one additional observation is warranted.  Having rejected
as arbitrary and capricious LINA's interpretation, as applied here, of "foresee" as meaning
"to see beforehand" and "anticipate," the Court is left with the remainder of LINA's
interpretation of "unforeseeable" in its February 11th letter: "LINA construes the term
'unforeseeable' to be that which a reasonable person could reasonably foresee under the
same or similar circumstances."   Corrected for its grammatical inconsistency, LINA's
interpretation appears to be that an event is "unforeseeable" when a reasonable person could
*not* reasonably foresee it under the same or similar circumstances.  LINA argues that because
the Policy defines the term "Covered Accident" (as "[a] sudden, unforeseeable, external
event"), and LINA thereafter interpreted the term "unforeseeable" in the manner just

described, usage of the federal-common-law ERISA definition of "accident" would be inappropriate.

In *Critchlow*, the Second Circuit held that "the developing federal common law used in ERISA cases to determine whether a death . . . was, within the meaning of an ERISA-regulated insurance policy, either accidental or the result of an intentionally self-inflicted injury," was reflected in "th[e] subjective/ objective analysis" applied in *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125–26, 1129 (9th Cir. 2002), under which

> [t]he court first asks whether the insured subjectively lacked an expectation of death or injury. If so, the court asks whether the suppositions that underlay the insured's expectation were reasonable, from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences. If the subjective expectation of the insured cannot be ascertained, the court asks whether a reasonable person, with background and characteristics similar to the insured, would have viewed the resulting injury or death as substantially certain to result from the insured's conduct.

*Critchlow*, 378 F.3d at 257–58 (quoting *Padfield*, 290 F.3d at 1126) (emphases in *Critchlow* and citations in *Padfield* omitted); *see Wickman v. Northwestern National Insurance Co.*, 908 F.2d 1077, 1088–89 (1st Cir. 1990) (first setting forth a subjective/objective analysis); *see generally Lennon*, 504 F.3d at 627–29 (Clay, J., dissenting) (discussing *Wickman*'s analysis and progeny).

Because LINA abandoned any reliance on the intentionally-self-inflicted-injury exclusion from coverage under the Policy, the distinction between that exclusion and the term "accident," which drives the analysis in *Critchlow*, is not directly applicable here. Nonetheless, while LINA is correct that the Policy employs the term "unforeseeable" to define the term "accident," its definition of "unforeseeable" uses the term "foresee" to define

that which is "unforeseeable," thus tautologically *repeating*, rather than *interpreting*, the Policy's use of the plain but undefined term "unforeseeable." As a result, there is no meaningful interpretation of the term "unforeseeable" to which the Court could apply deference. Moreover, LINA's definition twice invokes reasonableness. Aside from using the term "foreseeable" in lieu of "accident[al]," LINA's definition is indistinguishable in any meaningful way from the objective portion of the "subjective/ objective analysis" adopted by the Second Circuit in *Critchlow*.

On remand, therefore, LINA must make an individualized determination of whether Plaintiff is entitled to benefits under the Policy. To guide its analysis, the Court provides LINA with the following instructions: (1) because it abandoned reliance on any basis for denial other than the requirement of eligibility that a "Covered Accident" be "unforeseeable," LINA may not deny benefits on any other basis; (2) LINA must interpret the term "unforeseeable," in a manner consistent with the "entirety," as well as each term, of the Policy, as well as the standards of contract interpretation in ERISA described above; and (3) LINA's conclusion regarding Plaintiff's entitlement to benefits must apply its interpretation of the Policy to the facts and circumstances of Mr. Danouvong's car collision, describing which, and why, particular facts in the record support, detract from, or are irrelevant to its conclusion. *Cf. Demirovic*, 467 F.3d at 216 (remanding to plan administrator for "further consideration" of claim for benefits in order to "tak[e] into account all of [the claimant's] circumstances," and stating that "[i]n making this determination, the [plan administrator] should . . . give appropriate consideration to—though it is not necessarily required to credit—the evidence submitted by" the claimant).

IV.    Attorney's Fee and Costs

"In any action [brought pursuant to ERISA] . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1).  In considering whether Plaintiff is entitled to costs and fees in this case, the Court "weigh[s] five factors":

> (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

*LaForest v. Honeywell Int'l Inc.*, 569 F.3d 69, 75 (2d Cir. 2009) (quoting *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d Cir. 1987)).

These factors make clear that attorney fees and costs are not appropriate at this juncture in this case.  While Plaintiff has prevailed in her position that LINA applied a categorical rule that renders its determination that she is not entitled to benefits arbitrary and capricious, she has neither alleged nor shown LINA's actions to have been taken in bad faith.  In addition, while the Court concludes that LINA's interpretation of the Policy was arbitrary and capricious, it has not found Plaintiff's claim for benefits meritorious.  *See DeVoll v. Burdick Painting, Inc.*, 35 F.3d 408, 414 (2d Cir. 1994) (declining to award an attorney's fee under ERISA where a party's "claims were neither frivolous nor made in bad faith, and were supported by existing out-of-circuit law or good faith arguments"); *cf. ACMAT Corp. v. Greater New York Mut. Ins. Co.*, 282 Conn. 576, 591–92 (2007) (concluding that insured is entitled to attorney's fees in litigating a declaratory-judgment action against

insurer "only if the policyholder can prove that the insurer has engaged in bad faith conduct prior to or in the course of the litigation").

V.      Conclusion

For the reasons stated above, Defendant's Motion for Judgment [Doc. # 18] is DENIED, Plaintiff's Motion for Judgment [Doc. # 27] is GRANTED IN PART, and this case is REMANDED to Defendant with instructions.


IT IS SO ORDERED.


        /s/
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 30th day of September, 2009.